Filed 6/17/26  P. v. Bernhardy CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHARLES ALLEN BERNHARDY,<br><br>    Defendant and Appellant. | A173424<br><br>(Sonoma County<br>Super. Ct. No. SCR756692-1) |

While driving his pickup truck under the influence of alcohol, defendant Charles Bernhardy hit a motorcycle from behind and killed its rider, 23-year-old Vance Stammer.  A jury convicted Bernhardy of several crimes, including second degree murder under *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*), and he was sentenced to 19 years to life in prison.  Bernhardy's only claim on appeal is that his murder conviction must be reversed because there was insufficient evidence of implied malice.  We reject this claim and affirm.

I.

FACTUAL AND PROCEDURAL
BACKGROUND

### A.    *Bernhardy's Drinking Before the Crash*

The crash that killed Stammer occurred shortly before 9:00 p.m. on September 6, 2022, in Santa Rosa.  Around 5:00 p.m. that evening, then 37-

year-old Bernhardy finished work at the tire center where he was employed and went home. A co-worker and friend testified that Bernhardy was sober when he left.

Bernhardy returned to the apartment he had recently moved into with his girlfriend, Amanda T., and her two children, ages 11 and 6. Around 5:30 p.m., Bernhardy visited his neighbor, Kenneth R., who lived in the apartment next door with his adult daughter and her boyfriend. Kenneth R. testified that Bernhardy "seemed kind of buzzed" and was "loud and hyper," and he thought that Bernhardy might have already consumed alcohol before arriving. While visiting over the next hour and a half, the men each took two shots of whiskey from a "regular-sized" shot glass.

Around 7:00 p.m., the two men left Kenneth R.'s apartment to buy more alcohol. Bernhardy drove them in his 1980's Chevrolet C20 pickup truck. Kenneth R. testified that at this point, Bernhardy's impairment level was "a 4 or 5" on a scale of 1 to 10.

Bernhardy first drove himself and Kenneth R. to the bank to withdraw money. They then proceeded to a grocery store to buy alcohol. Kenneth R. testified that on the way to the grocery store, Bernhardy "was just being erratic[] inside the truck and going real fast." Kenneth R. estimated that they were travelling at 65 to 70 miles per hour, and he told Bernhardy to slow down.

At one point, while still traveling very fast, Bernhardy ran over several white plastic lane markers in the middle of the road. Kenneth R. testified that it was apparent the truck was being damaged, as "[y]ou [could] see the pieces flying up, from the grille of the truck, flying right up in the air." When he told Bernhardy, "You're doing damage to your truck," Bernhardy responded, "What do you think would happen if I hit those?" Bernhardy then

2

ran over more of the lane poles.  Kenneth R. testified that he told Bernhardy, " 'You're going to kill some of us,' or 'kill me.' "

Bernhardy and Kenneth R. arrived at the grocery store around 7:30 p.m.  They picked out a bottle of whiskey and got in the checkout line.  While in line, a woman said to Bernhardy, "Oh.  You're getting whiskey?"  According to both Kenneth R. and the store cashier, Bernhardy said something like, "Yeah.  That would make your pussy wet."  The cashier testified that despite this inappropriate comment, Bernhardy did not appear impaired such that he should not be sold alcohol.  A receipt timestamped 7:39 p.m. showed that Bernhardy purchased a bottle of Jim Beam whiskey and "a single packet of Kool-Aid."

After the two men left the grocery store, Bernhardy drove them back to the apartment complex, and they returned to Kenneth R.'s apartment.  There, they "took turns" taking shots of whiskey.  Kenneth R. estimated that they each took seven to nine shots, ultimately consuming "[t]hree-quarters of the bottle."[1]

Kenneth R. characterized himself as "drunk," at 10 on a scale of 1 to 10, and he testified that Bernhardy seemed to be at the same level.  Bernhardy "was hyper and moving around, waving" some on his feet, and he was "loud."  Kenneth R.'s daughter and her boyfriend, who were also present, agreed that Bernhardy "seemed very amped" and was "excessively repeating himself over and over" about a light fixture he wanted to help them repair.  The daughter also testified that Bernhardy's intoxication level was 10 on a scale of 1 to 10.

---

[1] Kenneth R. was unsure whether the whiskey bottle was "a fifth or a pint," but he used his hands to indicate the bottle was about 18 inches high, "[n]ot a small quantity."

At some point, Amanda T. came next door and told Kenneth R. that Bernhardy was "a bad drinker" and the other man "should stop drinking with him." Kenneth R. told Bernhardy that he should go home. Bernhardy left, and Kenneth R. went to bed.

Amanda T. testified about Bernhardy's prior alcohol use and her reaction when she realized that Bernhardy was drinking that night. In the seven years leading up to the crash during which she had known Bernhardy, she had seen him drunk "maybe five or six times" only. She nonetheless believed he had a problem with alcohol because when he did drink, "he'd have a hard time stopping" and would "[u]sually [drink] till he would pass out."[2]

Amanda T. described two prior incidents during which Bernhardy was drunk and exhibited concerning behavior. First, about a year before the crash, he was drinking alcohol, and the two got into argument at her parents' home. She called the police, "because he would get very angry and accuse [her] of cheating and different things like that, so [she] wanted him to probably leave the house."

Second, less than a month before the crash, Bernhardy and Amanda T. were drinking with Kenneth R. to celebrate the new apartment. Bernhardy got "drunk and smashed everything in the house," including a television. After this incident, Amanda T. told Bernhardy that if he wanted to stay in a relationship with her, he could not drink any more. She testified that Bernhardy "promised he wouldn't drink" at all. Thus, she "[d]idn't

---

[2] Amanda T. testified that Bernhardy regularly took Norcos (hydrocodone) and smoked marijuana, and he tested positive for both substances after the crash. As noted below, the jury acquitted Bernhardy of a charge of driving under the influence of drugs, so we do not detail the evidence of his drug use.

4

understand why he would be" drinking with Kenneth R. on the night in question.

After Amanda T. went next door and told Bernhardy to come home, he returned to their apartment. She testified that his eyes "were glazed over," "[h]e was leaning over," and he smelled "[l]ike alcohol." Amanda T. put his intoxication level at an 8 out of 10, explaining that she would consider 10 out of 10 to be "[f]alling-over drunk."

Bernhardy became "[v]ery angry" after Amanda T.'s daughter referred to a prior occasion when he accused her mother of cheating. Amanda T.'s daughter said, "You remember, Mom. You're cheating on him with Marco. Ha ha. Just kidding." A "full-blown fight" over cheating ensued between Bernhardy and Amanda T., and "he was breaking stuff and screaming and yelling."

Feeling "unsafe," Amanda T. "grabbed the kids and ran out of the house." At 8:34 p.m., she called 911. During the call, which was played for the jury, she reported that her boyfriend "got drunk and he started smashing things all over." Amanda T. then drove to a grocery store nearby to meet the police, not returning to the apartment until around 9:30 p.m. When she got there, Bernhardy was not home.

*B.    The Crash*

At 8:47 p.m., Bernhardy left the apartment and drove away in his truck.[3] The crash occurred approximately five minutes later, at the

---

[3] GPS data from Bernhardy's cell phone revealed his location throughout the night, confirming that he was at work until around 5:00 p.m., went to the bank and then the grocery store around 7:30 p.m., and left "the general location of his apartment" at 8:47 p.m. That data also confirmed his driving route before and after the crash and showed that he sent a text message to Amanda T. about one minute before the crash occurred.

intersection of Fountaingrove Parkway and Sedgemoore Drive. As we will discuss, the evidence showed that Bernhardy hit Stammer's motorcycle from behind, ejecting Stammer, and the motorcycle became lodged in the truck's grille. Bernhardy then hit another car before driving away, stopping only after he ran into a median and the truck became inoperable.

A woman driving westbound on Fountaingrove in her Honda testified that as she was proceeding up the hill, she saw "an older-model pickup truck" that was "parked askew on the right curb on the westbound lanes" with "[i]ts right front wheel . . . up on the curb."

The woman continued westbound on Fountaingrove until she reached its intersection with Sedgemoore. She testified that she slowed to around 10 miles per hour to turn right onto Sedgemoore. She then noticed "a light behind [her], and then as [she] was turning right, [she] felt [her] car hit from behind" with a "medium impact." The woman looked to her left and "saw the same truck go around [her] vehicle and continue westbound on Fountaingrove." She was confident that it was the truck that hit her because "immediately after [she] was hit, [she] didn't see any other vehicles." The Honda's rear exhaust pipe was "sheared off," and the car's "bumper was out of alignment." She did not see a motorcyclist before or after the collision.

A different woman driving on Fountaingrove reached the intersection with Sedgemoore and noticed a young man, Stammer, lying in the middle of the road. A backpack was lying nearby, and "his shoes were off and his helmet was off." Stammer was still alive, but the woman "could tell he was badly hurt." She called 911, and police were dispatched to the scene at 8:57 p.m.

Stammer was transported from the crash scene to the hospital. He was in "[a] very deep coma," his neck was broken, and he had subdural

6

hematomas on both sides of his head.  Attempts to alleviate the pressure on his brain were unsuccessful, and he was eventually taken off life support.  An autopsy showed that Stammer died of "complications of blunt-force injury of [the] head."

### C.    Bernhardy's Flight and Arrest

Meanwhile, other witnesses saw Bernhardy's truck on Fountaingrove after the crash.  As one man was driving eastbound on that road, about one-and-a-half to two miles from the Sedgemoore intersection, he saw an old Chevrolet pickup truck approaching from the other direction going "very, very fast, definitely over the speed limit," which was 35 miles per hour.  The truck struck the center median, "straddled it[,] and then regained some[] control" and returned to the road.  The truck's driver "might have slowed down to the speed limit" when the vehicle was on the median, but not "drastically, like a normal person would. . . .  [H]e just kept going."

The other driver, who had swerved away from the median to avoid the truck, pulled over and parked.  He observed a sapling tree on the median "that was completely toppled over" and a motorcycle lying on the median, "halfway in a bush."  The man and other bystanders who arrived "surveyed the area to make sure there was no rider" and did not see anyone.

Another witness was at the intersection of Fountaingrove and Mendocino Avenue when she saw a truck come to a "quick stop" on the road.  The truck had "front-end damage" and "light-colored smoke" was coming from the hood, but "[i]t didn't look like it was going to catch fire."  A man exited the truck and ran down an embankment, toward a mobile home park.  The man kept looking back at the truck and was not travelling "very fast," but he did not appear to be in pain.

7

A different motorist drove by the same spot and saw a man running away from a damaged truck, "like [he was] trying to get away in hurry." The motorist testified that the man was "stumbling," such that he appeared to be "under [the] influence of alcohol."

A deputy sheriff located Bernhardy's truck, which did not appear to be operable, stopped in the road on Mendocino. After a bystander indicated the direction in which the truck's driver had left, the deputy and other law enforcement officials unsuccessfully attempted to locate Bernhardy.

Amanda T. eventually learned that Bernhardy had been in a crash but did not see him again that night. When she returned to their apartment the following morning, however, Bernhardy was there. He indicated that "he thought that he had just crashed his truck," at which point she told him "[t]hat there was an accident and a 23-year-old boy was hit." Bernhardy asked Amanda T. to call the police and tell them he was at the apartment.

Later that morning, the police arrived at the apartment and arrested Bernhardy, who said he thought he had a broken ankle. He was transported to the police department, where he was interrogated, and then to the hospital for treatment.

D.    *Bernhardy's Interrogation and Prior* Watson *Advisement*

Recordings of various statements Bernhardy made to the police and in jail calls were played for the jury. He generally took responsibility for driving drunk, although he also blamed the police for not responding quickly enough to Amanda T.'s 911 call to prevent him from doing so. We focus on Bernhardy's interrogation, during which he made the most relevant statements. We also discuss a *Watson* advisement about the dangers of drunk driving that he signed in connection with a previous conviction, which he also made statements about during the interrogation.

8

At the outset of the interrogation, Bernhardy told the two police officers questioning him that he "fucked up." He explained that he "had a few drinks with a neighbor" after work, estimating that he took "six to eight shots of Jim Beam," which was "[w]ay too much." Bernhardy said his level of drunkenness the previous night was "a 6 or 7 at least" on a scale of 1 to 10.

After Bernhardy finished drinking with the neighbor, he got mad at Amanda T. and "broke some shit." Eventually, he "told her, fuck you, I'm gonna go kill myself," and then "got in the fucking truck and left."[4] He claimed that he stopped drinking "at least a couple hours before th[e] accident" and "was fine when [he] got in the truck," but he also admitted, "I probably shouldn't have drove."

Bernhardy stated that after leaving the apartment, he headed to his cousin's house. As he went over a hill on Fountaingrove, he "felt the rearend of [his] truck like come up off the ground" and "the truck go bam, like, [he] hit someone or something." He also stated, "I thought maybe I hit a divot, or, or somethin' in the road or . . . blew a tire or something."

Bernhardy claimed that he stopped and "looked around," but he "never [saw] the vehicle or the pole or whatever the fuck it was" he hit. He denied continuing to drive after the crash, saying that the impact was "hard" and it "dead-in-tracks stopped" him. When one of the officers told him he hit a motorcyclist and continued to drive with the motorcycle stuck to his truck, he stated, "I don't recall none of that." He also did not recall hitting the median, though he was "not saying [he] didn't" because he "had too much to drink" and the alcohol negatively impacted his memory.

_____

[4] Later, Bernhardy indicated that he was not actually suicidal and probably said this to indicate he was "angry" and needed to leave the situation.

Bernhardy reported that after getting out of his truck, he realized his "ankle was fucked up" and he "couldn't find [his] phone," which the evidence tended to suggest fell out of the truck when he hit the median. Not "know[ing] what else to do," he started walking home. But his ankle hurt too much to continue, and he "ended up falling asleep in between some . . . bushes" before walking the rest of the way home the next morning.

Bernhardy admitted that he had a 2018 conviction for "wet reckless" driving (the 2018 conviction).[5] He reported that on that occasion, he "drank two beers" and crashed his vehicle after being distracted by some deer. When asked whether he was told during the previous proceeding "about the dangers of drinking and driving and how it's inherently dangerous to human life," he responded, "No, I don't recall, no." He was supposed to take a court-ordered DUI class, but it never happened because "COVID took over."

The officers then presented Bernhardy with the plea form he signed in connection with the 2018 conviction. The form, which was admitted into evidence, included as an addendum the following *Watson* advisement: "You are hereby advised that being under the influence of alcohol or drugs, or both, impairs your ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If you continue to drive while under the influence of alcohol or drugs, or both, and as a result of that driving, someone is killed, you can be charged with murder."

---

[5] A DUI charge is sometimes reduced to a "wet reckless" if "there is either a very low blood alcohol level or there are other facts that make the case difficult to prosecute." At trial, Bernhardy admitted the allegation that he suffered the 2018 conviction, which was under Vehicle Code section 23103.5. All further statutory references are to the Vehicle Code unless otherwise noted.

Bernhardy then admitted that he signed the *Watson* advisement, although he could not remember doing so. The signature indicated agreement with the following statement: "I have discussed my case with my attorney and I understand this advisement. [¶] I have read this document or have had it read to me, and I understand it."[6] After one of the officers summarized the advisement's contents, Bernhardy stated, "I already knew anybody who drinks and drives[,] it's bad for anybody's health, so—" The officer said, "You and others, right?" Bernhardy responded, "Correct."

E. *The Physical Evidence and Related Expert Testimony*

Some of the travel of Bernhardy's truck, Stammer's motorcycle, and the Honda was recorded by nearby residential surveillance cameras, and the recordings were played for the jury. A police officer qualified as an expert in traffic collisions and photogrammetry used one of the recordings to calculate the respective speeds of the Honda, the motorcycle, and the truck at the intersection before the crash site. He testified that the Honda was going 41 miles per hour, which was followed by the motorcycle going 42 miles per hour, which was followed by the truck going 79 miles per hour. The videos also indicated that the motorcycle's running lights were working and that the motorcycle slowed down as it approached the intersection where the Honda turned.

Bernhardy's truck was located over two miles from the collision site and less than a quarter mile from where he struck the median and the motorcycle was found. There was a "pretty full" water bottle full of "pinkish-colored liquid," which "smelled like a fruity beverage mixed with alcohol," on

---

[6] The attorney who represented Bernhardy in the prior case could not remember him. She testified that her typical practice was to review plea agreements with her clients "line by line," including giving the relevant advisements.

the truck's front-passenger floorboard.  The investigating officer, who found the bottle, testified that based on Bernhardy's purchase at the grocery store "it would be reasonable to believe that there was Kool-Aid and alcohol, potentially Jim Beam, within."

The truck's grille was missing and later located about a mile away.  The front right headlight was also missing, and the hood was dented.  The truck's right front tire was "destroyed and barely attached to the wheel," and the wheel was "bent and damaged."  The investigating officer, who was also qualified as an expert in traffic collisions, opined that the truck struck multiple objects.  He testified that it would require "a substantial level of force" to bend the wheel, and he believed this damage resulted from striking the median.

The investigating officer also opined that since the deflated tire was wrapped around the wheel, it appeared that the truck kept driving after the tire went flat.  It "would be quite noticeable" to someone who drove on a tire in this condition, as it would be loud, there would be "violent" bumping, and the vehicle would be hard to steer.

Stammer's motorcycle's rear wheel and tire were damaged, and its exhaust pipe and tail were "bent upwards and damaged."  The investigating officer concluded that the truck hit the motorcycle from behind, which "fully ejected" Stammer into the air, and "the rear wheel of the motorcycle got lodged . . . underneath the front bumper of the truck."  The officer opined that after becoming stuck in the truck's grille, the motorcycle "would have been readily visible" to the truck's driver "from the front cabin and through the windshield."

Bernhardy's blood was drawn at the police station before his interrogation started, approximately 13 hours after the crash.  Bernhardy

weighed 215 pounds at the time, and his blood alcohol content (BAC) was zero percent. The criminalist who analyzed the sample testified that "everybody is too impaired to operate a motor vehicle safely at a [BAC] of .08 percent and higher." She estimated that a 215-pound man who drank 10 standard-sized drinks would have a BAC of up to .17 percent, and his BAC would reach zero percent within 13 hours or less.

A mechanic who inspected the motorcycle and the pickup truck after the crash testified that neither had any mechanical or other defects that would have caused a collision. Based on the evidence as a whole, the investigating officer opined that "Bernhardy caused the collision when he drove under the influence of alcohol . . . [and] additionally, by driving at an unsafe speed." Stammer was not at fault, because he "was not driving grossly above the speed limit," he was slowing down before the crash, and there was nothing to suggest he "contributed to this collision in any way other than just being on the roadway."

*F.     Procedural History*

An information charged Bernhardy with felony counts of murder, gross vehicular manslaughter while intoxicated, driving under the influence (DUI) of alcohol causing injury with a prior conviction, hit and run driving causing death, and driving under the influence of any drug causing injury with a prior conviction, and a misdemeanor count of hit and run driving causing property damage.[7] In connection with the vehicular manslaughter count, it

---

[7] The charges were brought under Penal Code sections 187, subdivision (a) (murder), and 191.5, subdivision (a) (gross vehicular manslaughter), sections 23560 and 23153, subdivisions (a) (alcohol-based DUI causing injury) and (f) (drug-based DUI causing injury), and sections 20001, subdivision (b)(2) (hit and run causing death), and 20002, subdivision (a) (hit and run damaging property). The 2018 conviction

was alleged that Bernhardy fled the scene, and in connection with the DUI counts it was alleged that he personally inflicted great bodily injury (GBI).[8] Finally, several aggravating factors were alleged, including that the crimes disclosed a high degree of cruelty, viciousness, or callousness (cruelty factor) and that Bernhardy engaged in violent conduct indicating a serious danger to society (violent-conduct factor).[9]

The jury acquitted Bernhardy of drug-based DUI causing injury and convicted him of the remaining counts. It also found true the allegations that he fled the scene after committing gross vehicular manslaughter and inflicted GBI while committing the alcohol-based DUI causing injury. Finally, as to all of the felony convictions, the jury found true the two aggravating factors that were submitted to it, the cruelty factor and the violent-conduct factor.

The trial court sentenced Bernhardy to a total term of 19 years to life, composed of a term of 15 years to life for the murder and a consecutive term of four years, the aggravated term, for the hit and run causing death.[10] A

---

discussed above was alleged as the prior conviction supporting the two DUI counts.

[8] The allegation of fleeing the scene was made under section 20001, subdivision (c). The same allegation was made as to the count of hit and run causing death but was stricken during trial. The GBI allegations were made under Penal Code section 12022.7, subdivision (b).

[9] In addition to these two factors, it was alleged that the victim was particularly vulnerable, Bernhardy was being concurrently sentenced, Bernhardy's convictions were numerous or of increasing seriousness, and Bernhardy's prior performance on probation or other supervision was unsatisfactory. (See Cal. Rules of Court, rule 4.421(a)(1), (3), (7) & (b)(1), (2), (5).) Four other aggravating factors were stricken before trial.

[10] The parties inaccurately state in their briefing that Bernhardy's total term is 23 years to life, but the record is clear that the trial court imposed 15 years to life for the murder plus four years for the hit and run. The determinate and indeterminate abstracts of judgment also reflect the correct term.

14

term of 15 years for the gross vehicular manslaughter, composed of the aggravated term of 10 years and a consecutive term of five years for fleeing the scene, was imposed and stayed, and the conviction for the alcohol-based DUI causing injury was stricken "as duplicative." Finally, the sentence for the misdemeanor was deemed served.

## II.
### DISCUSSION

Bernhardy claims that his murder conviction must be reversed because there was insufficient evidence of implied malice. We are not persuaded.

### A. *General Legal Standards*

Murder is the unlawful killing of a human being with malice aforethought. (Pen. Code, § 187, subd. (a).) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature," and it is "implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Id.*, § 188, subd. (a)(1) & (2).) All murders committed with implied malice are of the second degree. (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)

"Express malice is an intent to kill," but implied malice does not require such intent. (*People v. Gonzalez, supra*, 54 Cal.4th at p. 653.) Instead, "[m]alice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." (*Ibid.*) Thus, implied malice has "an objective component (an intentional act endangering the life of another) and a subjective component (knowledge and disregard of the danger)." (*People v. Pierce* (2025) 114 Cal.App.5th 508, 523.) "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or

15

speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 989.)

*Watson* held that vehicular homicide may be charged as second degree murder "if the facts surrounding the offense support a finding of 'implied malice.' " (*Watson*, *supra*, 30 Cal.3d at p. 294.) The Supreme Court explained that in contrast to the mind state required for the lesser crime of gross vehicular manslaughter, "[i]mplied malice contemplates a subjective awareness of a higher degree of risk . . . , and involves an element of wantonness which is absent in gross negligence." (*Id.* at p. 296.) And although gross negligence is evaluated objectively, based on whether a reasonable person would have appreciated the risk, "a finding of implied malice depends upon a determination that the defendant actually appreciated the risk involved, i.e., a subjective standard." (*Id.* at pp. 296–297, italics omitted.)

In evaluating a claim of insufficient evidence, " 'we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) Substantial evidence is " ' "evidence that is reasonable, credible, and of solid value." ' " (*People v. Bertsch and Hronis* (2026) 19 Cal.5th 183, 316.) Reversal is not required unless " 'it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

    B.    *Substantial Evidence Supports Bernhardy's Conviction.*

Bernhardy asserts that there was insufficient evidence that he acted with implied malice, i.e., a subjective "awareness that his conduct endangered human life or involved a high probability that death would result." He is incorrect.

To determine whether a defendant "actually appreciate[d] the risk to life involved" in driving while intoxicated, "courts generally refer to the following factors" derived from *Watson*: " ' "(1) [BAC] above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of hazards of driving while intoxicated; and (4) highly dangerous driving." ' " (*People v. Pierce*, *supra*, 114 Cal.App.5th at p. 531; *People v. Wolfe* (2018) 20 Cal.App.5th 673, 682–683.) But " ' "courts have recognized that there is no particular formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach." ' " (*People v. Nevarez* (2025) 115 Cal.App.5th 552, 562.) In other words, we may consider other factors bearing on a defendant's mens rea, and there need not be evidence of all four factors listed to sustain a finding of implied malice. (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988– 989; see, e.g., *People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 700–701 [defendant's lack of intoxication did not preclude finding that he committed vehicular homicide with implied malice].)

Here, there is ample evidence to support the jury's finding that Bernhardy acted with implied malice. Most glaringly, Bernhardy admittedly signed an acknowledgment of being advised that "it is extremely dangerous to human life to drive while under the influence of alcohol or drugs" and that he could be charged with murder if his intoxicated driving caused someone's death. He took numerous shots of liquor over a few hours despite knowing he had trouble controlling himself when he drank, and several witnesses described him as extremely intoxicated. He intentionally ran into lane poles

17

while driving Kenneth R., who warned him that he was going to kill someone, and on Fountaingrove he drove at an extremely high speed, running off the road both before and after colliding with Stammer's motorcycle. He was also texting while driving and brought an open container of alcohol with him in the truck. Taken as a whole, the evidence permitted a reasonable inference that Bernhardy knew his extremely reckless driving carried a high probability of death.

In resisting this conclusion, Bernhardy attempts to pick apart the evidence supporting the four factors listed in *Watson*. For example, he emphasizes that there was "no solid proof of [his BAC] at the time of the accident," and he downplays the *Watson* advisement he signed by noting that he did not take any court-ordered alcohol-education classes as part of the prior proceeding. But while he cites other cases in which there was evidence of such circumstances, none of those decisions establish that the evidence here was thereby insufficient. (See *City of San Diego v. Boggess* (2013) 216 Cal.App.4th 1494, 1502 [specific facts in other cases are "unhelpful" when performing substantial-evidence review].) Likewise, although Bernhardy may be correct that some of the additional factors the prosecutor relied on in closing argument did not tend to show implied malice, he fails to convince us that the evidence as a whole was lacking. In sum, Bernhardy's prior knowledge of the deadly risk of drunk driving, his acute intoxication, and his highly dangerous driving throughout the night in question was sufficient to support his conviction of murder.

## III.
### DISPOSITION

The judgment is affirmed.

18

_____

Humes, P. J.


WE CONCUR:



_____

Banke, J.



_____

Smiley, J.


*People v. Bernhardy*  A173424

19